**IN THE U.S. DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES. OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 CR 257 |
| v. | ) | |
| | ) | |
| JOHN BRANDON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On January 27, 2011, the grand jury returned a four-count superseding indictment against John Brandon ("Brandon"), charging two counts of possession of a controlled substance with intent to distribute in violation of 21 U.S.C. §841(a)(1), one count of illegal possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §924(c)(1)(A), and one count of felon in possession of a firearm in violation of 18 U.S.C. §922(g)(1). (R. 21, Sup. Indict.) Defendant Brandon has filed two motions to suppress evidence obtained from a warrantless search of his residence and any illegal fruits derived therefrom. (R. 46, Mot. to Sup.; R. 55, Supp. Mot. to Supp.) He argues that the law enforcement officers conducted a warrantless search of his apartment, that his girlfriend did not have authority to consent to the search, and that she did not consent. The Court conducted a hearing on the two motions to suppress on December 17, 2012 and heard arguments on December 20, 2012. For the following reasons, the Court denies both motions.

## FACTUAL BACKGROUND

The government and Defendant Brandon agree on the following facts.  On October 20, 2009, shortly before 9:00 p.m., Chicago Police Detective Patrick O'Donovan ("O'Donovan") and Officer Jack Dedore ("Dedore") (collectively, the "officers") responded to a call regarding a person with a gun at the 1900 block of South Sawyer, Chicago, Illinois.  When O'Donovan and Dedore arrived at the intersection of 19th Street and South Sawyer Avenue they saw a man they now know to be Defendant Brandon coming out of a residence at 1902 South Sawyer Avenue, where Brandon resided in the first floor apartment.

O'Donovan and Dedore approached Brandon because he fit the description of the person with the gun.  The officers conducted a patdown of Brandon.  The patdown did not yield any weapons or other contraband.  Brandon told the officers that he was leaving his residence and going to his car, a gold-colored Buick LeSabre parked a few feet away.  Detective Donovan shined a flashlight into the car's interior and observed surgical gloves, a surgical mask, an electric grinder, tin foil, and Dormin sleep aid.  Based on his experience as a police officer, Detective Donovan recognized these items to be items used for the packaging of narcotics.  The officers then searched Brandon's jacket and recovered a baggie containing heroin and cocaine.  The officers arrested and handcuffed Brandon and placed him in the back of a patrol car.  At some point, Brandon stated that he could turn over a gun to the officers.

After the officers handcuffed Brandon, his girlfriend, Nequila Hearnes ("Hearnes"), exited the three-flat building at 1902 South Sawyer wearing a bathrobe.  Hearnes then entered the rear of the patrol car so she could speak to Brandon.  After speaking with Brandon, Hearnes told the officers that she would retrieve a gun from a safe in the apartment.  Hearnes entered the

apartment and retrieved the gun from the safe, which had a keypad combination lock. The safe also contained a bag of cocaine and approximately $19,000 in cash, which O'Donovan removed from the safe.

The government and Defendant Brandon disagree about whether Hearnes had the authority to consent to the search of Brandon's apartment and whether Hearnes gave consent. During the suppression hearing, the following witnesses testified: Detective Patrick O'Donovan, Sergeant Charles Daly, Sergeant William Bowden, Special Agent Michael Walsh, and Nequila Hearnes. The Court carefully evaluated the demeanor and credibility of each witness who testified at the hearing, including body language, tone of voice, facial expressions, mannerisms, and other indicative factors. In addition, the Court admitted the following exhibits: Government Exhibit 3 - consent to search form; Government Exhibit 4 - evidence bag; Government Exhibit 7 - chain of custody report; Government Exhibit 10 - OEMC recording; Government Exhibit 11 - recorded telephone calls; and Government Exhibit 13 - copy of Brandon's license. The Court summarizes below the testimony of the witnesses regarding contested factual issues.

## I.     Detective Patrick O'Donovan's Testimony

In addition to providing testimony about many of the facts above, Detective O'Donovan testified that, after he shined the light into Brandon's car, he informed Dedore about the contents of Brandon's car. At that time, Dedore was standing by Brandon, who was approximately five feet from O'Donovan. Detective O'Donovan relayed the information in a normal tone of voice. According to O'Donovan, Brandon became visibly nervous and began speaking rapidly. Brandon then spontaneously told the officers that he did not know anything about a man with a gun but that he had a little dope in the left breast pocket of his jacket. After this statement,

Officer Dedore reached into Brandon's left breast pocket and took out a baggie. Based on his over thirty years working for the Chicago Police Department and his experience with narcotics investigations, O'Donovan believed the baggie contained cocaine and heroin. The officers then placed Brandon in handcuffs and informed him of his Miranda rights. O'Donovan testified that Brandon stated that he understood his rights but wished to speak with the officers. Specifically, Brandon asked what he could do to help himself get out of the situation and suggested that he could provide the officers with a gun or information about other people involved with narcotics.

Brandon told the officers that his girlfriend could retrieve a gun from inside the apartment. At this time, he nodded his head towards the apartment where Hearnes stood on the porch in a bathrobe. O'Donovan allowed Hearnes to get into the back seat of the unmarked police car with Brandon to have a private discussion. When Hearnes exited the car, Brandon told the officers that Hearnes would go into the apartment and retrieve a gun. O'Donovan testified that he did not offer to let Brandon go free or promise Brandon anything in exchange for him turning over a gun. Additionally, O'Donovan adamantly testified that it was not his personal practice to make promises to potential arrestees in exchange for weapons and he did not believe this was a common practice within the Chicago Police Department.

O'Donovan testified that at some point it became apparent that Hearnes lived in the apartment at 1902 South Sawyer Avenue. He testified that Hearnes, who was in a bathrobe, told him that she had a child who was also at the apartment. O'Donovan, however, did not recall, asking Hearnes if she lived at the apartment, if she had a key to the apartment, whose name was on the lease or if she paid any bills for the apartment.

O'Donovan testified that he asked Hearnes if she was capable of handling a firearm safely, and she said no. O'Donovan then asked Hearnes to consent to him accompanying her into the apartment to retrieve the gun. She said that he could. At this point, despite the fact that he did not plan to search the apartment itself, O'Donovan retrieved a consent to search form from the trunk of his car. O'Donovan explained that he filled in the top portion of the consent form, which included Hearnes' name, the address of the residence, and the date and time of the consent. (*See* Gov't. Ex. 3, Consent to Search Form.) O'Donovan recorded the time as 21:05, meaning that he began filling out the consent form at 9:05 p.m. O'Donovan then handed Hearnes the form to review while the two stood on the porch. He gave her a few minutes to read over the form. He asked her if she understood the form and she acknowledged that she did. Hearnes then signed the consent form. (*See* Gov't. Ex. 3.)

After obtaining Hearnes' consent both orally and in writing, Detective O'Donovan entered the apartment directly behind Hearnes. Hearnes led him to a safe, which he described as a "fire box." O'Donovan watched Hearnes kneel down and punch in the combination to the safe. Hearnes then reached in, pulled out a gun, and handed the gun to O'Donovan. Detective O'Donovan stood behind Hearnes while she opened the safe. He testified that he could see into the safe once Hearnes opened it. As Hearnes reached into the safe to pull out the gun, O'Donovan saw a plastic bag containing what he believed to be cocaine and a bag containing U.S. currency in the safe. Hearnes told O'Donovan that the gun, drugs and money were not hers. O'Donovan brought the gun, drugs and money outside and showed them to Officer Dedore.

After exiting the apartment, Detective O'Donovan called his supervisor, Sergeant Charles Daly, to the scene. After Sergeant Daly arrived, O'Donovan observed Sergeant Daly speaking

with Hearnes.  It appeared that Sergeant Daly reviewed the consent form with her, though O'Donovan was not within earshot of their conversation.  After this conversation with Hearnes, Sergeant Daly signed the consent to search form.  (*See* Gov't Ex. 3.)  At some point, Officer Dedore also signed the consent form.  (*Id.*)

O'Donovan testified that he and Dedore transported the evidence, including the signed consent form, to the Homan Square police station.  At the station, Office Joseph Chausse helped begin the inventory process.  O'Donovan testified that Dedore placed the signed consent form into an evidence bag, filled out the information on the outside of the bag, and heat sealed the bag.  (*See* Gov't Ex. 4, Evid. Bag.)   Later that evening, sometime after midnight, Detective O'Donovan delivered the sealed evidence bag containing the completed consent to search form to the twenty-four hour desk, where the officers maintain evidence before it goes to the depository.  At some point after midnight, O'Donovan returned Brandon's car to 1902 South Sawyer, giving the keys to Hearnes.

## II.       Sergeant Charles Daly's Testimony

Sergeant Charles Daly ("Daly") testified that he was Officer Dedore's and Detective O'Donovan's supervisor on the night of the incident.  He arrived on the scene at approximately 9:15 or 9:30 p.m. after receiving a call from Detective O'Donovan.  He arrived after O'Donovan had retrieved the gun, currency and drugs from inside the apartment.  He testified that he interviewed Hearnes about the consent to search form.  Hearnes told him that she had signed it. Daly testified that Hearnes did not tell him that either Officer Dedore or Detective O'Donovan made any promises to her or Brandon.  Although Sergeant Daly testified that he could not recall asking Hearnes verbatim if she lived at 1902 South Sawyer, he stated that he was sure he asked

her whether she lived there. He did not, however, ask her how long she had lived there, how long she had been there that day, or for any identification.

Sergeant Daly testified that it is standard practice to obtain an Event Number from the Office of Emergency Management and Communication ("OEMC") to record on the consent to search form. Based on a time-stamped tape of Sergeant Daly's call to OEMC, Daly testified that he called OMEC at 9:49 p.m. (*See* Gov't Ex. 10, OEMC tape.) Sergeant Daly acknowledged that the Event Number provided by OEMC on the tape was 18635, however, the Event Number he wrote on the consent to search form was 28653. (*See id.;* Gov't Ex. 3.) According to Daly, the Event Numbers do not match because he transposed the last two numbers and misread his own handwriting from where he initially wrote down the Event Number while speaking with OEMC.

Sergeant Daly testified that later that night, he signed a sealed evidence bag containing the signed consent to search form. (Gov't Ex. 4.) Daly also testified that Officer Dedore signed the heat-sealed bag as well. He recognized Dedore's signature on Government's Exhibit 4 based on years of supervising Dedore and approving his reports. Sergeant Daly acknowledged that no one had written the inventory number associated with the consent to search form on the outside of the evidence bag. Daly also admitted that there was a sustained disciplinary incident against him where, in a separate case, he had signed an inventory bag that understated the amount of currency inside the bag. According to Daly, that incident was his only infraction relating to inventorying evidence.

### III.    Sergeant William Bowden Testimony

Sergeant William Bowden ("Bowden"), a custodian of records for the Evidence and

Recovered Property Section of the Chicago Police Department described the contents of the

chain of custody report for the consent to search form.  (*See* Gov't Ex. 7, Chain of Cust.)

According to Bowden, Government Exhibit 7 shows that Office Joseph Chausse ("Chausse")

created an inventory report for the consent to search form at 00:57:08 on October 21, 2009 and

submitted it for approval at 00:57:09.  (*Id*. at 2.)  Bowden explained that Chausse would not have

been able to submit this report without entering in the description of the evidence, namely that it

was a consent to search form.  If anyone had attempted to change any information about the

inventory report, the chain of custody report would reflect that.  Bowden testified that no one

made any changes to the inventory report.  Bowden stated that he believed that the officer with

the particular piece of evidence in his possession would have been the one who created the

inventory report.  In this case, therefore, he would assume that Chausse had the consent to search

form in his possession.  He also stated that an officer would place the inventory into storage after

the sergeant approved the inventory report.  In this case, Sergeant Daly approved the inventory

report at 1:24 a.m. on October 21, 2009.  (*Id*. at 1.)

### IV.    Special Agent Michael Walsh's Testimony

Michael Walsh ("Walsh"), an agent for the Bureau of Alcohol, Tobacco and Firearms,

testified about his role investigating this case.  Specifically, Agent Walsh testified that in April

2010 he took custody of the evidence collected by the Chicago Police Department, including the

sealed evidence bag containing the signed consent to search form, Government Exhibits 3 and 4.

Agent Walsh explained that Government Exhibit 4 was sealed and intact when he obtained it

from the Chicago Police Department and that it remained in that condition until the Assistant United States Attorney cut open the bag in his presence.

During Agent Walsh's investigation, he learned that the lease for the apartment at 1902 South Sawyer was in Brandon's name. Hearnes' name was not on the lease. Hearned told Agent Walsh on a few occasions, however, that she had been living at 1902 South Sawyer prior to the night of the incident. Agent Walsh also testified that when he interviewed Hearnes in February 2010, she informed him that she had her own set of keys to the apartment.

**V.      Nequila Hearnes's Testimony**

In addition to some of the facts stated above, Hearnes testified that after she exited the apartment on the night of the incident she spoke with one of the officers who told her that he would release Brandon if he gave them a gun. Hearnes explained that she spoke with Brandon in the back of the police car. Brandon instructed her to retrieve his gun from a safe in the apartment. She informed the officers that she would go into the apartment and bring them back a gun. She also informed Detective O'Donovan that she is familiar with handling firearms.

Hearnes testified that she did not give Detective O'Donovan or Officer Dedore consent to enter the apartment with her and she did not ask either officer to enter the apartment with her. According to Hearnes, when she entered the apartment, O'Donovan remained on the porch. She testified that she did not see Detective O'Donovan again until she turned around to leave after retrieving the gun from the safe and O'Donovan was standing behind her. Hearnes testified that O'Donovan took the gun from her and demanded that she re-open the safe, which she did. O'Donovan then removed a bag of cocaine and some money from the safe, neither of which belonged to Hearnes. Hearnes testified that Brandon told her the combination to the safe before

she entered the apartment. Hearnes testified that she had known the entire combination prior to that evening, but had forgotten part of it so she needed Brandon to remind her that night.

Hearnes testified that she did not sign a consent to search form before she entered the house to retrieve the gun. Rather, later that night, between 1:30 a.m. and 2:00 a.m., the officers returned to the apartment. According to Hearnes, she was sleeping when they arrived and her fifteen-year-old daughter, who was staying at the apartment as well, alerted her that someone was at the door. The officers returned Brandon's car and keys to her, as well as insurance papers and Hearnes' birth certificate, which she had given them earlier. Hearnes testified that the officers asked her to sign a document which they claimed was an inventory sheet. According to Hearnes, she could only see part of the paper she was signing, which she confirmed at the hearing was the consent to search form. Hearnes testified that the officers covered up the typed paragraphs regarding her rights and consent so that she could only see the top of the paper, which included her name, and the signature line on the lower part of the page. She testified that one of the officers held the partially-covered consent form against the wall. According to Hearnes, before the officers arrived, she was upset with them and did not trust them because they had searched the apartment without her permission and arrested Brandon after promising they would release him in exchange for a gun. She testified that, despite these feelings, she signed the partially-covered paper without reading it because she was tired and wanted the officers to leave.

Hearnes testified that she started dating Brandon in 2003 and that she loves him very much. She initially testified that she was not living at 1902 South Sawyer on October 20, 2009, but later testified that she was living there off and on. She testified that she kept clothes and belongings at the apartment. She also stated that her daughter stayed there as well sometimes

and kept some of her belongings there too.  Hearnes stated that she would come and go regularly, sometimes staying at her parents' apartment where her other children lived.  She also claimed multiple times that she did not have a key to the apartment and denied telling Special Agent Walsh that she had her own key.  In addition, Hearnes also testified that she has been convicted of four felonies.  She explained that she was on parole on October 20, 2009 – the date of the incident – and had told her parole officer that she lived at her parents' address.  She testified that admitting to living at 9102 South Sawyer would have been a violation of her parole.

During her testimony, the government played phone calls recorded while Hearnes was at Wright Correctional Facility.  After hearing Government Exhibit 11, Hearnes recalled that she had a phone call with Brandon on March 6, 2010.  During that call, Brandon repeatedly asked her if she had told the investigators that she did not live at 1902 South Sawyer and that she had not wanted the officers to enter the apartment.  (*See* Gov't Ex. 11.)  During her testimony, Hearnes acknowledged that at the end of the call Brandon stated "You know what to do, right?"  According to Hearnes, what she needed to do was tell the truth.  She did acknowledge, however, that Brandon told her that he wanted her to say that she did not live at 1902 South Sawyer.

In addition, Hearnes testified that she had forgotten about this March 6th call when she stated during her grand jury testimony, five days later, that she had not spoken to Brandon at all about the incident.  (*Id*.)  Hearnes also testified that she received a call on April 18, 2010 from Brandon's mother, who told Hearnes certain pieces of information that she should "remember" about the incident, including that Hearnes did not live at the apartment.  She explained that Brandon's mother said she was going to send Hearnes a letter from another address telling Hearnes what she needed to remember.  Hearnes testified that Brandon's mother was not present

at the incident so did not have any memory of what happened.

## LEGAL STANDARD

When law enforcement officials conduct a warrantless search, the government must demonstrate "by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement." *U.S. v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *U.S. v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)). Courts have upheld warrantless arrests if the arresting law enforcement officials "have probable cause to believe that the individual engaged in criminal conduct." *U.S. v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009).

Further, law enforcement agents may lawfully gain access to a defendant's home without a warrant if the officers reasonably believed that the person giving them access had the actual or apparent authority to consent to the search. *U.S. v. Ryerson*, 545 F.3d 483, 489 (7th Cir. 2008); *Ga. v. Randolph*, 126 S. Ct. 1515, 1521, 164 L. Ed. 2d 208 (2006) (finding that a court can "recognize[] the validity of searches with the voluntary consent of an individual possessing authority.") Apparent authority to consent to a search exists "when the facts available to an officer at the time of a search would allow a person of reasonable caution to believe that the consenting party had authority over the premises." *Id.* (citing *Ill. v. Rodriguez*, 497 U.S. 177, 188 (1990)). When evaluating whether apparent authority existed, courts must consider what the officers knew at the time they sought consent, not facts that came to light after the search began. *U.S. v. Groves*, 470 F.3d 311, 319 (7th Cir. 2006). An officer has "a duty to inquire further as to a third party's authority to consent to a search, if the surrounding circumstances make that person's authority questionable." *U.S. v. Goins*, 437 F.3d 644, 648 (7th Cir. 2006); s*ee also U.S.*

*v. Alexander*, 573 F.3d 465, 474 (7th Cir. 2009).

In determining if a person has apparent authority to consent to a search, law enforcement officers may consider a variety of factors, including whether the person consenting possesses a key to the home, lives at the residence, or performs household chores at the home. *Groves*, 530 F.3d at 510. In *Groves,* the court also considered whether the person giving consent received mail at that residence, kept clothing at the home, and was allowed into the home when the owner was not present. *Id.* The *Groves* court, however, specified that the factors it listed were not an exhaustive list and were merely offered to show the "types of facts that should and could be considered in evaluating the issue of authority to consent to search." *Id.* at n. 3.

## ANALYSIS

Brandon argues that the Court should suppress the evidence that the officers obtained during the search of his apartment because Hearnes did not have authority to consent to the search and never consented. The government responds that the officers had sufficient information to reasonably believe that Hearnes had apparent authority, without any additional inquiry. Moreover, the government contends that Hearnes had actual authority to authorize the search, which she did both orally and by signing a written consent form.

## I.     Credibility Determination

As a threshold matter, Detective O'Donovan and Hearnes offered competing and contradictory versions of the events on October 20, 2009. The Court, therefore, must make a credibility determination based on the testimony at the hearing and its observations of the witnesses.

Notably, Detective O'Donovan testified consistently throughout his entire testimony and testified consistently with Sergeant Daly. During his testimony, O'Donovan even conceded that he may not have made all of the best decisions that evening, such as allowing Hearnes to open the safe and retrieve the gun on her own. Such concessions give credibility to his testimony. Hearnes, however, changed certain facts multiple times during her testimony, including, significantly, whether or not she lived at 1902 South Sawyer. Not only was Hearnes unable to remain consistent during her testimony at the hearing, but she also provided testimony that the government thoroughly and repeatedly impeached using her grand jury testimony, prior statements given to Agent Walsh, and recorded phone calls. Indeed, Agent Walsh's testimony impeached Hearnes, who claimed both that she did not possess a key to the 1902 apartment and that she never told Agent Walsh that she did.

Hearnes also did not make eye contact with the Court during her testimony, unlike Agent Walsh, Sergeant Daly and Detective O'Donovan. Rather, Hearnes acted fidgety throughout her testimony, particularly when the government played the recorded phone calls. She vacillated from being flippant to combative during her testimony, even yawning and rolling her eyes at times. Hearnes also laughed at points while listening to those calls and denied that the calls occurred prior to hearing the recordings. Moreover, the contents and tone of the recorded call between Hearnes and Brandon indicated that Brandon was attempting to coach Hearnes regarding her testimony before the grand jury that occurred several days later. Indeed, the fact that Hearnes lied in her grand jury testimony, five days after a call with Brandon discussing the incident, by stating that she had never discussed the incident with him, indicates that she was being coached and did not want law enforcement to know. The phone calls further reveal that

she may also have been coached regarding her statements to the law enforcement officers and even her testimony in front of this Court. Her demonstrated willingness to lie to law enforcement and under oath significantly undermines her credibility. The Court also notes Hearnes' extensive criminal background and multiple violations of probation as well as her long-term, intimate relationship with Brandon for the last nine years, both of which undercut her credibility.

As a result, overall, the Court finds the testimony of Detective O'Donovan highly credible and significantly more credible than Hearnes' opposing testimony. The Court analyzes the consent issues in light of this credibility determination.

## II.      Authority to Consent

The Supreme Court has held that a third-party with common authority over a residence has the actual authority to consent to a search of that residence. *See Randolph*, 547 U.S. at 110; *U.S. v. Matlock*, 415 U.S. 164, 170, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242 (1974). Courts in this circuit have consistently held that a live-in girlfriend has actual authority to consent to a search of the home. *See e.g., Johnson v. Thurmer*, 624 F.3d 786, 793 (7th Cir. 2010); *U.S. v. Ryerson*, 545 F.3d 483, 487 (7th Cir. 2008) (finding defendant's ex-wife and then girlfriend had actual authority); *Groves*, 530 F.3d at 510 (upholding finding that girlfriend was a co-occupant who had common authority over the premises); *U.S. v. Denberg*, 212 F.3d 987, 992 (7th Cir. 2000) (upholding finding that girlfriend who lived with defendant had actual authority).

Here, Hearnes lived in the apartment with Brandon for over a month before the incident. Although at the hearing Hearnes testified at points that she was not living at 1902 South Sawyer at the time of the incident, the government impeached this testimony with a previous statement

she gave to Agent Walsh in February 2010. She also told Sergeant Daly that she lived there when discussing the consent to search form on October 20th. Additionally, she told Agent Walsh that she had been living there and had a key to the apartment. *See e.g., Groves*, 530 F.3d at 509-10 (possessing the key to a home is a factor that could be considered when evaluating whether a person had authority over a residence). Moreover, she ultimately admitted during the suppression hearing that she lived "off an on" at 1902 South Sawyer; stated that she kept clothes there; and testified that her fifteen-year-old daughter stayed there as well and kept some of her belongings at the apartment. *See e.g., Ryerson*, 545 F.3d at 487 (finding that ex-wife who left many of her and her baby's belongings in the home had actual authority); *U.S.. v. Denberg*, 212 F. 3d 987, 991-92 (7th Cir. 2000) (finding it relevant to actual authority determination that defendant's girlfriend had her clothing, two children and the children's toys at the home). In addition, Hearnes testified that she gave the officers her birth certificate, indicating that she kept significant belongings at 1902 South Sawyer in addition to her clothing. She also knew her way around the apartment, as evidenced by her ability to take Detective O'Donovan directly to the safe. Indeed, Hearnes even testified that she knew the combination to the safe prior to the night of the incident. Additionally, on the night of the incident, Hearnes exited the apartment wearing a bathrobe, evidencing that she was more than just a casual visitor. Brandon also informed the officers that Hearnes could enter the apartment and he did not object to her entering the apartment, even though Officer Dedore remained with Brandon while Hearnes went inside. Further, Hearnes also testified that she stayed at the apartment the night of the incident even though Brandon had been arrested, undercutting the claim that 1902 South Sawyer was not her

residence. Based upon all of these facts, the Court finds that Hearnes was a co-occupant of the apartment with common authority and therefore had actual authority to consent to its search.[1]

Even assuming that Hearnes did not have actual authority, she had apparent authority to consent to a search of the apartment. Courts have found apparent authority to consent to a search "when the facts available to an officer at the time of a search would allow a person of reasonable caution to believe that the consenting party had authority over the premises." *Ryerson*, 545 F.3d at 489; *see also Rodriguez*, 497 U.S. at 188 (finding that someone has apparent authority if "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.").

As discussed above, Detective O'Donovan testified credibly and consistently about the events in question on the evening of October 20, 2009. According to his testimony, prior to entering the apartment with Hearnes' consent, the officers had numerous indications that Hearnes had apparent authority. First, the officers observed Hearnes walk out of the apartment in her bathrobe at approximately 9:00 p.m. A reasonable person would assume, based on social norms, that a woman walking outside from a residence in her bathrobe at night is staying at that residence and shares the space with the other occupant. As the Supreme Court explained in

---

[1] Notably, Brandon does not address the issue of actual authority in his motion papers. Rather, Brandon specifically argues that the relevant inquiry is what the officers knew at the time to consent, without differentiating between actual and apparent authority. (R. 53, Mot. to Sup. Reply at 1-2 ("Hearnes did not have actual or apparent authority . . . [a]s the pertinent inquiry involves the facts available to the officer at the moment consent is obtained . . .") (internal quotations and citations omitted).) The analysis for whether a person has actual authority, however, does not relate to knowledge or an impression that an officer has at a particular moment. Instead, the test for actual authority focuses on the relationship of the consentor to the area searched. *See e.g.*, *Rodriguez*, 497 U.S. at188-189 (stating that a search is invalid if the facts available to the officer at the moment would not warrant a man of reasonable caution that the consenting party had authority, unless authority actually exists).

*Randolph*, reflecting on *Matlock*, "When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did, she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants usually make about their common authority when they share quarters." *Randolph*, 547 U.S. at 111. Here, the bathrobe is similar to the baby on the hip as an indicator that Hearnes lived there.

Brandon furthered the officers' belief that Hearnes lived there or at least had access to and control over the apartment, by stating that she was his girlfriend rather than a one-time guest. Brandon also informed the officers that Hearnes would enter the apartment and retrieve the gun, indicating a familiarity with the premises. *See Ryerson*, 545 F.3d at 489 (finding that an ex-wife's familiarity with premises, along with other evidence that she lived there, "make it reasonable for the police to believe she could consent" to the search of the premises.) The officers also saw Brandon's license, which listed a different home address, and looked up the registration for his car, listing the same alternate address. The officer may have believed, therefore, that Brandon, who was leaving the apartment while Hearnes remained inside in a bathrobe, was the visitor. Additionally, as discussed further below, Hearnes signed a consent form consenting to "a complete search [] of the premises/vehicle under [her] lawful control and described as 1902 S. Sawyer 1st Floor Chicago, IL, 60623." (Gov't Ex. 3.)

Although the officers could have made additional inquiries, such as whether Hearnes had a key, whether she stored clothing at the apartment, or how long she had lived there, failure to conduct further inquiry does not undermine the validity of the search if the facts "warrant a man of reasonable caution" to believe the consenting party has authority. *U.S. v. Goins*, 437 F.3d

644, 649 (7th Cir. 2006) (finding no additional inquiry necessary, after facts indicated consentor had authority, even though there was some contradictory evidence). The Court finds that the totality of the circumstances favor a conclusion that a reasonable person would have believed that Hearnes had common authority over the residence. Indeed, Detective O'Donovan testified that, although he could not specifically recall asking Hearnes if she lived there, it was apparent to him that she did.

Finally, Brandon argues that, even if Hearnes was a co-occupant with common authority over the apartment, she lacked common authority over the locked safe that he kept in the closet in his bedroom. The Court finds that Hearnes had common access and authority over the safe because (1) Hearnes testified that she knew the combination prior to October 20, 2009; (2) Brandon informed her of the combination again that evening; (3) Brandon gave her specific authorization to open the safe and remove the gun; and (4) she led O'Donovan to the safe and operated the combination lock. Brandon, therefore, specifically authorized her control and access over the residence and safe by repeatedly giving her the combination to the safe and by instructing her to retrieve the gun. Although Brandon argues that he gave Hearnes only limited access to and authority over the safe, the Court "will not [] engage in such metaphysical subtleties in judging the efficacy of [Brandon's] consent." *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (finding that defendant, in allowing a third-party to use a duffel bag and leaving it in his house, assumed the risk that the third-party would allow someone else to look inside); *U.S. v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("[W]here a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including

government agents."); *Antonelli v. Sherrow*, 2005 WL 2338813, at *6 (N.D. Ill. Sept. 21, 2005) (rejecting argument that third party lacked authority to search of defendant's whole computer, that he left with his ex-wife for her and her family to use while he was incarcerated, because defendant had not given her permission to use the hard drive).

Moreover, even if Hearnes lacked actual authority over the safe, she had apparent authority. "For purposes of searches of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents. Rather, apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched, because these characteristics are particularly probative of whether the individual has authority over the property." *U.S.. v. Jackson,* 598 F.3d 340, 345-48 (7th Cir. 2010); *see also U.S. v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("Third-party consent to a search can legitimately be given whether the premises to be searched are as expansive as a house or as minute as a briefcase."). As explained above, Hearnes informed the officers that she would retrieve the gun from the safe, led Detective O'Donovan to the safe, and opened the safe with the combination. Each of these facts, particularly Hearnes' statements that she would open the safe and that she opened the safe with the combination, would indicate to a reasonable person that Hearnes had access and authority over the safe. *See e.g., Basinski*, 226 F.3d at 835 (finding that although "a reasonable person would be less likely to believe that a defendant granted free access to the contents of locked containers. . . courts also consider whether the defendant provided the third parry with a combination or key to the lock."); *see also U.S. v. Rodriguez*, 888 F.2d 519, 523 (7th Cir. 1989) (finding that a wife had apparent authority to consent to a janitor room to which

her husband, from whom she was separated, gave her a key). Moreover, the officers had no indication from Hearnes, Brandon or otherwise that Hearnes did not have access to or control over the safe, unlike the third party in *Basinski,* for example, who the defendant instructed never to open the briefcase at issue and to destroy it rather than allowing anyone else to peer inside it, and who lacked the combination to the briefcase. *See Basinski*, 226 F.3d at 835. In fact, Brandon told the officers that Hearnes would retrieve a gun from the safe. Indeed, Hearnes only told Detective O'Donovan that none of the contents of the safe belonged to her after she had opened the safe and Detective O'Donovan had retrieved the contents.

Furthermore, Detective O'Donovan retrieved the contraband from the safe after observing it in plain view. "[L]aw enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." *Ky. v. King*, 131 S. Ct. 1849, 1858, 179 L. Ed. 2d 865 (2011) (citing *Horton v. Cal.*, 496 U.S. 128, 136–140, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990)). It is uncontested that Hearnes opened the safe, not Detective O'Donovan or any other officer. Furthermore, O'Donovan credibly testified that as Hearnes removed the gun from the opened safe, he saw the rest of the contents of the safe in plain view. Because Hearnes had authority to consent to a search of the residence, and did in fact consent to such a search, as discussed below, O'Donovan was rightfully in the residence. O'Donovan's seizure of the drugs and money he viewed in the safe while lawfully in the apartment does not violate the Fourth Amendment.

**III. Consent**

Brandon argues that, even if Hearnes had authority to consent to a search of the apartment, she never gave her consent. Hearnes testified that she did not sign the consent form until approximately 1:30 a.m. on October 21, 2009, long after the search. Detective O'Donovan, however, testified credibly and consistently that she did sign the consent form before O'Donovan entered the apartment. Indeed, the consent form lists the date and time as 9:05 p.m. on October 20, 2009. (*See* Gov't Ex. 3.) Additionally, Sergeant Daly testified that he arrived on the scene shortly after the search and confirmed with Hearnes that she had signed the form. Furthermore, Sergeant Daly made a recorded phone call at 9:49 p.m. to OEMC to obtain the Event Number for the consent to search form. (*See* Gov't Ex. 10.)

Hearnes' testimony that she signed a partially-covered consent form, without reading it, when officers who she distrusted allegedly presented it to her between 1:30 a.m. and 2:00 a.m was simply not credible. Moreover, the evidence regarding the steps the officers took to inventory the consent form, which remained in a heat-sealed evidence bag until preparation for this hearing, also undercuts Hearnes' story. Notably, the chain of custody report for the consent to search form indicates that Officer Chausse inventoried the form at 12:57 a.m. on October 21, 2009 and submitted it for approval at 12:58 a.m. (Gov't Ex. 7.) Sergeant Bowden testified that these time stamps are computer-generated and that Officer Chausse would have needed to have sufficient information to describe the consent form when inventorying it in the system. Moreover, there is no indication on the chain of custody report that anyone altered any information entered regarding the consent to search form. Hearnes could not, therefore, have signed the form between 1:30 and 2:00 a.m., as she claims, as the form had been inventoried

prior to that time.  In fact, Sergeant Daly approved the form at 1:24 a.m.  (Gov't Ex. 7.)  The chain of custody form does list the "date recovered" as October 21st, consistent with Hearnes story.  An officer, however, enters this date manually which could account for the error in date as the item was inventoried just past midnight on October 21st but recovered from Hearnes on October 20th.  While there may have been procedural inaccuracies regarding the consent to search form, including that the Event Number listed does not match the Event Number OEMC gave Sergeant Daly and that no one wrote the inventory number from the form on the evidence bag containing it, this does not impact the Court's conclusion in light of the totality of the evidence.  The Court, therefore, concludes that Hearnes did sign the consent form before the search.

The Court also credits Detective O'Donovan's testimony that he asked Hearnes if he could accompany her into the apartment to retrieve the gun.  O'Donovan's testimony on this point was unequivocal.  The Court also finds it unlikely that trained officers would jeopardize their safety by allowing an unknown woman, who was connected to the Defendant whom they had just arrested, to enter an apartment and retrieve a gun on her own, as Hearnes claims.  The Court, therefore, finds both that Hearnes had the authority to consent to a search of the apartment and that she consented prior to the search.[2]

---

[2] Because the search was not unlawful based on these grounds, the Court will not address the government's additional arguments, such as Brandon's implied consent, exigent circumstances, and inevitable discovery.

**IV.  Supplemental Motion to Suppress Based on Promise of Freedom**

Brandon next argues that the Court should suppress the gun and other evidence obtained because the officers promised him that he would not face prosecution if he tendered a gun to the officers.  The Court disagrees.

Although Brandon filed a supplemental motion to suppress, he failed to sufficiently articulate or develop his argument that a promise by the officers warrants suppression. (*See* Sup'l Mot. to Sup; R. 60, Def.'s Sup'l Mot. Reply.)  Specifically, Brandon failed to state the reason why a promise of freedom would warrant suppression, arguing instead only that "law enforcement failed to uphold its end of the agreement" by now prosecuting Brandon.  (Sup'l Mot. to Sup. at 2.)  Such an argument would potentially support a motion to dismiss the case, if anything, not to suppress evidence.[3]  Notably, the government attempted to assist Brandon in its Response by speculating about what theories of suppression Brandon might be proffering.  (R. 58, Pl.'s Sup'l Mot. Resp. at 4-13 (arguing against theories that (1) Hearnes' consent was involuntary because of an alleged false promise of immunity; (2) the officers vested Brandon with "public authority" to commit crimes; and (3) entrapment by estoppel."))  Brandon, however, failed even in his Reply to offer any clarification regarding what legal theory might support suppression.  (Def.'s Sup'l Mot. Reply.)

---

[3] Brandon does cite to *U.S. v. Jordan*, No. 09 CR 1034 (N.D. Ill.) (Leinenweber, J.) as an example of a district court granting a motion to suppress when an officers made a promise not to charge the defendant if he provided guns.  (Sup'l Mot. to Sup. at 2-3.)  The docket from that case, however, indicates that Judge Leinenweber entered a minute order stating that Defendant Jordan's motion to suppress was granted in part.  There is no written opinion or rationale provided to serve as persuasive authority for this Court.  Furthermore, the Court cannot gleam from the minute entry whether Judge Leinenweber in fact suppressed any evidence, or whether he granted the part of the motion to suppress regarding statements, which are not at issue here.

Brandon argued during the hearing, however, that fundamental fairness supports suppression because Brandon would not have provided the officers with the gun, and consequently the additional drugs, if not for a promise of immunity. The evidence, however, does not support Brandon's argument that the officers promised anything to him or Hearnes. First, Detective O'Donovan testified that he did not make any promises, including a promise to release Brandon in exchange for a gun. Indeed, O'Donovan testified consistently and credibly on this point, even stating that he did not have a practice of making such promises and that officers he worked with did not make such promises. Second, consistent with O'Donovan's testimony, O'Donovan wrote in the Original Case Incident Report that "without promising anything" the officers allowed Hearnes and Brandon to speak. Finally, Hearnes' story that the officers told her that they would release Brandon if he gave them a gun lacked credibility. Notably, during the March 6, 2009 call with Brandon, Hearnes stated that she told law enforcement that she let the officers into the apartment because they threatened her. (Gov't Ex. 11.) At the hearing, however, Hearnes offered a different story, claiming instead that the officers promised Brandon would go free.

Moreover, officers may use trickery and deceit and may promise to seek favorable consideration from the prosecutor to elicit cooperation or an admission. *See e.g.*, *U.S. v. Villalpando*, 558 F.3d 1124, 1128 (7th Cir. 2009) ("[W]hile a false promise of leniency may render a statement of involuntary, policy tactics short of the false promise are usually permissible"); *U.S. v. Charles*, 476 F.3d 492, 497-98 (7th Cir. 2007) ("promises to seek favorable consideration from the prosecutor do not undermine the voluntariness of a confession.") The evidence does not show that the officers went beyond such permissible

behaviors. At most, the evidence shows that Brandon inquired whether he could better his position if he assisted the officers in some way and the officers asked how he might be able to help himself. O'Donovan testified that neither he nor Officer Dedore promised to let Brandon go if he provided them with a gun, rather Brandon told them that he might be able to give them information on people involved with narcotics or give them a gun. Indeed, at the hearing Detective O'Donovan explained why he does not make promises to arrestees in exchange for contraband or information, noting that most of the time the arrestee has nothing worthwhile to provide. Rather, he may tell an arrestee that he can make a recommendation to the prosecutor about any cooperation given. As a result, the Court finds Detective O'Dronovan's testimony on this point credible. The evidence, therefore, does not support Brandon's argument that the officers offered an improper *quid pro quo*, gun for freedom, exchange requiring suppression.

## CONCLUSION

For the foregoing reasons, Defendant Brandon's motion to suppress evidence and supplemental motion to suppress evidence are denied.

**Date: December 27, 2012**

ENTERED

_____
AMY J. STUEVE
United States District Court Judge